## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

_____

SHANE E. PIERSON,

                     CV 10-66 -M-DWM-JCL

           Plaintiff,

     vs.                    FINDINGS & RECOMMENDATION
                                   OF UNITED STATES
                                   MAGISTRATE JUDGE

MICHAEL J. ASTRUE,
Commissioner of Social Security,

             Defendant.

_____

Plaintiff Shane Pierson brings this action under 42 U.S.C. § 405(g) seeking judicial review of the decision of the Commissioner of Social Security (Commissioner) denying his application for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, and for supplemental security income benefits under Title XVI of the Act, 42 U.S.C. §§ 1381-1383(c).

Pierson filed his application for benefits on June 15, 2005, alleging disability since February 2, 2003, due to multiple impairments including migraines, allergies, asthma, fibromyalgia, irritable bowel syndrome, depression, psoriasis, and a sleep disorder. Tr. 74-75. Pierson's application was denied

PAGE 1

initially and on reconsideration.  Tr. 51-52; 55-57.  After an administrative hearing at which Pierson appeared with counsel, an Administrative Law Judge found Pierson was not disabled within the meaning of the Act.  Tr.  16-33; 400-92.  The Appeals Council denied Pierson's subsequent request for review, thereby making the ALJ's decision the agency's final decision for purposes of judicial review.  Tr. 5-8.  Jurisdiction vests with this Court pursuant to 42 U.S.C. § 405(g).

Pierson was 32 years old at the time of his alleged onset date, and 37 years old at the time of the ALJ's decision.

## I.  STANDARD OF REVIEW

This Court's review is limited.  The Court may set aside the Commissioner's decision only where the decision is not supported by substantial evidence or where the decision is based on legal error.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005); *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Widmark v. Barnhart,* 454 F.3d 1063, 1070 (9th Cir. 2006).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities."  *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001).  This Court must uphold the Commissioner's findings

PAGE 2

"if supported by inferences reasonably drawn from the record." *Batson v. Commissioner of Social Security Administration*, 359 F.3d 1190, 1193 (9th Cir. 2004). "[I]f evidence exists to support more than one rational interpretation," the Court "must defer to the Commissioner's decision." *Batson*, 359 F.3d at 1193 (*citing Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir. 1999). This Court "may not substitute its judgment for that of the Commissioner." *Widmark*, 454 F.3d at 1070 (*quoting Edlund*, 253 F.3d at 1156).

## II. BURDEN OF PROOF

To establish disability, a claimant bears "the burden of proving an 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Batson*, 359 F.3d at 1193-94 (*quoting* 42 U.S.C. § 423(d)(1)(A)).

In determining whether a claimant is disabled, the Commissioner follows a five-step sequential evaluation process. 20 C.F.R. § 404.1520. The claimant bears the burden of establishing disability at steps one through four of this process. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). At the first step, the ALJ will consider whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). If not, the ALJ must determine at step two whether the

PAGE 3

claimant has any impairments that qualify as "severe" under the regulations. 20 C.F.R. § 404.1520(a)(4)(ii). If the ALJ finds that the claimant does have one or more severe impairments, the ALJ will compare those impairments to the impairments listed in the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If the ALJ finds at step three that the claimant has an impairment that meets or equals a listed impairment, then the claimant is considered disabled. 20 C.F.R. § 404.1520(a)(iii). If, however, the claimant's impairments do not meet or equal the severity of any impairment described in the Listing of Impairments, then the ALJ must proceed to step four and consider whether the claimant retains the residual functional capacity (RFC) to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant establishes an inability to engage in past work, the burden shifts to the Commissioner at step five to establish that the claimant can perform other work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v).

## III.  DISCUSSION

Following the steps in the sequential evaluation process, the ALJ first found that Pierson met the insured status requirement of the Act through December 31, 2005, and had not engaged in substantial gainful activity since his alleged onset date. Tr. 19. The ALJ found at step two that Pierson had the following severe impairments: morbid obesity, migraine headaches, irritable bowel syndrome, and

PAGE 4

psoriasis on his knees bilaterally.  Tr. 19.  At step three, the ALJ determined that

Pierson did not have an impairment or combination of impairments that met or

medically equaled any impairment described in the Listing of Impairments.  Tr.

22.  The ALJ also found that while Pierson's "medically determinable impairments

could reasonably be expected to produce the alleged symptoms," his "statements

concerning the intensity, persistence, and limiting effects of th[o]se symptoms

[were] not entirely credible."  Tr. 25.  Having done so, the ALJ next determined

that Pierson retained the residual functional capacity to perform a limited

 range of sedentary work. Tr. 23.  Although the ALJ found that Pierson could not

return to his past relevant work, he concluded that there remained a significant

number of jobs in the economy that Pierson could perform, including sedentary

work as a laminator, inspector, and semiconductor assembler.  Tr. 32-33.

Pierson challenges the ALJ's decision on several grounds, each of which is

discussed in turn below.

**A.  Severe Impairments**

Pierson argues the ALJ erred at step two by not classifying several of his

alleged impairments as severe.

An impairment is "severe" if it significantly limits the claimant's ability to

perform basic work activities.  20 C.F.R. § 416.921.  An impairment may be

considered non-severe if the evidence establishes only a slight abnormality that has no more than a minimal effect on an individual's ability to work. *See* SSR 85-28; *Yuckert v. Bowen*, 841 F.2d 303, 306 (9th Cir. 1988). The claimant bears the burden of establishing the severity of an alleged impairment by providing medical evidence consisting of signs, symptoms, and laboratory findings. 20 C.F.R. § 416.908.

        1.    Depression

    Pierson first argues the ALJ erred by not classifying his depression as a severe impairment. Although the ALJ accepted that Pierson suffered from depression, he found the condition affected Pierson "only intermittently" and was "fully controlled with medication." Tr. 20. The ALJ also found the fact that Pierson had "not sought psychiatric treatment other than to obtain medication from his primary care provider" indicated that his depression was not severe. Tr. 21. The ALJ acknowledged that there were "some medical sources who ha[d] found Mr. Pierson's depression to be severe or disabling," but rejected those opinions for reasons set forth elsewhere in his written decision. Tr. 21.

        Pierson challenges the ALJ's reading of the record, and argues there is ample evidence establishing that his depression was on-going and not fully controlled. Pierson maintains that evidence as to the severity and consistency of

PAGE 6

his depression can be found in treatment records from Dr. Susan Selbach, his primary care physician at the Veterans Administration.

It is true that the medical records from the Veterans Administration contain many references to Pierson's depression.  Tr. 168-98; 237-66; 299-311; 317-19. As the ALJ observed, however, for the most part those references show that Pierson's depression was well controlled with medication.  In October 2005, Dr. Selbach indicated that Pierson suffered from situational depression.  Tr. 252-53. Pierson's symptoms improved with treatment, and by July 2005 was "not continually anxious or depressed" Tr. 169-181.  Most of the medical records simply note that Pierson was taking prescription medication for depression, but do not describe any depression-related symptoms, complaints, or limitations.  See e.g. Tr. 173, 177, 179, 238, 243, 250, 258, 260, 263, 304, 318.  And as the ALJ recognized, while Pierson would sometimes experience periods of increasingly depressed mood, those periods were intermittent and temporary.  Tr. 20.  On the whole, the Veterans Administration medical records support the ALJ's determination that Pierson's depression was well-controlled with medication.

Pierson also argues that the ALJ overlooked records from Rashel Jeffrey, a clinical social worker at the Veterans Administration, and David Anderson, a licensed clinical professional counselor at the Western Montana Mental Health

Center.  Pierson argues these records demonstrate that his depression was severe, and contradict the ALJ's observation that he had not sought help for his depression from anyone other than his primary care physician.

While it might not have been accurate for the ALJ to state that Pierson had not sought help for his depression from anyone other than Dr. Selbach, he specifically discussed the opinions of Jeffrey and Anderson elsewhere in his opinion.  As the ALJ noted, Jeffrey saw Pierson between June 4, 2007 and July 7, 2007, and assessed him with GAF scores that are indicative of only mild mental impairments.  Tr. 21, 27, 328, 342.   The ALJ also addressed Anderson's treatment records from a four month period in 2005, noting that he wrote during his initial session that Pierson was "unable to work due to medical conditions." Tr. 30, 210.  The ALJ rejected Anderson's assessment, however, on the grounds that he (1) was not an acceptable medical source, (2) had not conducted any objective testing of Pierson's physical or mental abilities, and (3) had based his opinion on entirely Pierson's subjective complaints.  Tr. 30.  These were sufficiently germane reasons for declining to accept Anderson's initial assessment as to the severity of Pierson's mental impairments, including his depression.[1]

---

[1]  Because Anderson was not an acceptable medical source, the ALJ could reject his opinion for "germane" reasons, and was not required to cite the specific and legitimate reasons necessary to reject the contradicted opinion of an acceptable

2.    Pathological Aggressivity

Pierson maintains the ALJ erred by finding that his pathological aggressivity did not constitute a severe impairment because the medical opinions uniformly establish that the disorder significantly limits his ability to perform certain work related functions.  Pierson claims the ALJ did not to cite sufficient reasons for rejecting those medical opinions, and erred by substituting his own judgment for that of Pierson's medical providers.

*A.    Dr. Patricia Webber*

Dr. Patricia Webber performed a mental status evaluation in September 2005, at which time she diagnosed Pierson with a number of impairments including intermittent explosive disorder.  Tr. 213.  Dr. Webber concluded that Pierson "would be expected to have difficulty cooperating with coworkers and may have trouble with different types of employers," and "would be expected to be over-sensitive to critical feedback and challenges to his work."  Tr. 29, 212.  Dr. Webber believed that Pierson's "limitations in interpersonal skills" were "a major hurdle to long term employment."   Tr. 212.

The ALJ rejected Dr. Webber's opinion for two related reasons, observing

———————————————

medical source.  *See  Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).

both that Dr. Webber had not conducted "any objective testing that would allow

her to arrive at these conclusions," and had instead based her opinion primarily on

Pierson's self-reported limitations.  Tr. 29.   While Dr. Webber did conduct some

objective memory and language tests, there is nothing to suggest that those tests in

any way measured the severity of Pierson's intermittent explosive disorder or

resulting limitations.  Tr. 212, 217-218.  The only objective test result that appears

to have had any bearing at all on Pierson's social skills was one during which

"[h]e failed two out of three items designed to assess social and practical

judgment."  Tr. 218.  Whether Pierson has good social and practical judgment says

little, if anything, about the severity of his alleged pathological aggressivity.

Thus, the ALJ appropriately cited the lack of clinical findings as one reason for

rejecting Dr. Webber's opinion as to the severity of that impairment and any

corresponding limitations.

As the ALJ also observed,  Dr. Webber premised her opinion as to Pierson's

limited interpersonal skills in large part on what he told her during the evaluation.

Tr. 29.  Pierson  reported, for example, that he could not tolerate "people being

rude to him or making stupid arguments," had assaulted his daughter's boyfriend

on one occasion, often yelled at people while shopping, and would lose his temper

while driving.  Tr. 214-15.  Pierson also described using his size to intimidate

PAGE 10

others, and fighting with his wife.  Tr. 215.   Not surprisingly, Dr. Webber found

that Pierson's "[c]omments suggest[ed] a lack of patience with family, co-workers,

and the general public."  Tr. 215.  As discussed below, however, the ALJ found

for a number of clear and convincing reasons that Pierson was not entirely

credible.  Having done so, the ALJ appropriately rejected Dr. Webber's opinion to

the extent it was premised on Pierson's self-reported history.

When evaluating the severity of Pierson's pathological aggressivity at Step

2, the ALJ also found it significant that Pierson had "worked for several weeks at a

video store while undergoing a vocational evaluation."  Tr. 21.  As the ALJ noted,

when asked "if he had any problems interacting with the public during that time,"

Pierson indicated that he had not experienced any "problems with regard to his

anger or irritability."  Tr. 21.  Pierson did describe undergoing vocational training

that involved part-time work at a video store.  Tr. 30-31.  Although Pierson's

attendance was a problem, he did not describe any significant difficulty interacting

with the customers.  Tr. 30-31, 462.  Pierson also explained that he had

volunteered at the video store occasionally over the years, and had not had any

altercations or yelling matches or any other significant conflict with customers.

Tr. 463.   The ALJ properly found the fact that Pierson had been able to interact

appropriately with customers and the general public during this period was

PAGE 11

inconsistent with Dr. Webber's opinion.

Finally, the ALJ found the fact that there were no other records after Dr.
Webber's report describing or documenting "any further 'explosive' or
pathologically aggressive behaviors" suggested that the disorder was not severe,
and that Pierson's interpersonal skills were not as limited as Dr. Webber had
indicated.  Tr. 21, 29.  This too was a legitimate basis for rejecting Dr. Webber's
opinion.

### B.    Dr. Robert Bateen

Dr. Robert Bateen examined Pierson on October 14, 2005, and reported that
he "was polite and courteous throughout the examination" and "presented well
socially," with no unusual behaviors or mannerisms.  Tr. 251-53.  Dr.  Bateen
diagnosed Pierson with a "mood disorder secondary to medical condition," which
would account for "the situational nature of [his] depression."  Tr. 253.  As the
ALJ recognized, Dr. Bateen assigned Pierson a GAF of 65, which is indicative of
mild symptoms and someone who is generally functioning pretty well.  Dr. Bateen
wrote that Pierson was "intellectually capable and should have no difficulty
understanding, remembering, and carrying out detailed as well as simple
directions."  Tr. 253.  Dr. Bateen also observed that Pierson had "well-developed
social skills, and, while he may experience some irritability, should be able to

PAGE 12

interact with others on the brief and superficial basis necessary for many types of work." Tr. 253.  The ALJ found that Dr. Bateen's opinion was "internally consistent, well supported by medically acceptable clinical and diagnostic techniques, and consistent with the rest of the medical evidence" and gave it great weight.  Tr. 28.

Approximately two weeks after examining Pierson, Dr. Bateen completed a mental residual functional capacity assessment and psychiatric review technique form.  Tr. 229-36, 267-84.  Dr. Bateen check-marked boxes on the mental residual functional capacity assessment form indicating that Pierson's ability to interact appropriately with the general public was markedly limited and that his ability to accept instructions, respond to criticism, and get along with coworkers was moderately limited.  Tr. 230.  Dr. Bateen wrote that Pierson would "do best at work where he need not deal with the general public and where he need have only brief and superficial contact with others."  Tr. 231.  On the psychiatric review technique form, Dr. Bateen check-marked a box indicating that Pierson would have moderate difficulties maintaining social functioning.  Tr. 277.  As Dr. Bateen explained in the written portion of that assessment, however, Pierson had been "polite and cooperative during the examination and no social deficits were observed or described."  Tr. 279.  Dr. Bateen also explained that Pierson had been

PAGE 13

"able to work for up to 4 years and at times has been a supervisor suggesting that he is able to exert some control over his anger problems."  Tr. 279.

While the ALJ discussed and adopted Dr. Bateen's opinion as set forth in his October 14, 2005, examination report, he did not specifically discuss either of these two forms.  Nevertheless, any error on the ALJ's part in this regard is harmless.   The ALJ concluded based on the vocational expert's testimony that Pierson could perform sedentary work as a laminator, inspector, or semiconductor assembler.  Tr. 32.  According to the Dictionary of Occupational Titles, none of these jobs involve significant interaction or contact with people, like taking instructions and helping.  See DICOT 690.685-258, 669.687-014, and 726.684-034.  While Dr. Bateen believed Pierson would have difficulty interacting with members of the public, there is nothing in any of these job descriptions suggesting that they would involve such social interaction.  Pierson does not argue otherwise. *See e.g. Grunwald v. Astrue*, 2010 WL 5812704 *4 (D. Or. 2010); *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008) (holding ALJ's failure to incorporate postural limitations was harmless where the jobs at issue infrequently required the restricted functions).  As the ALJ noted in his decision, Dr. Bateen was of the opinion that Pierson could interact with others on the brief and superficial basis required for most work.  Tr. 28.  That opinion is consistent with

PAGE 14

Dr. Bateen's remarks in the written comment portion of the psychiatric review technique form and mental residual functional capacity form.  Tr. 231, 279.

   C.    *Dr. Paul Bach*

   Medical expert Dr. Paul Bach testified that Pierson's pathological aggressivity caused marked limitations in his ability to interact with the general public.   Tr. 413-14.  Although Dr. Bach agreed that Pierson was markedly limited in this area, he did so based not on any personal observations or contact with Pierson, but solely on his review of Dr. Webber's evaluation.  Tr. 413-14.  When asked by the ALJ, Dr. Bach specifically stated that he was basing his opinion on Dr. Webber's report.  Tr. 414.  Because the ALJ properly rejected Dr. Webber's opinion, it was appropriate for him to likewise discount Dr. Bach's opinions, which he admitted was predicated on Dr. Webber's.  In any event, as discussed above, the jobs the ALJ found Pierson capable of performing did not involve significant interaction or contact with people.

   3.    Fibromyalgia

   Pierson argues the ALJ erred by disregarding the severity of his fibromyalgia-related complaints of daily pain.  Specifically, Pierson maintains the ALJ erred by accepting that he was diagnosed with fibromyalgia but rejecting the severity of the symptoms giving rise to that diagnosis.  Dkt. 12, at 9.

PAGE 15

As discussed below, however, the ALJ provided clear and convincing reasons for finding Pierson less than entirely credible.  Having done so, he properly found that while Pierson suffered from fibromyalgia, his symptoms were not as severe as he claimed.

### 4.   Sleep Apnea and Asthma

Pierson also maintains the ALJ erred by finding that his sleep apnea was not a severe impairment and engaged in a selective reading of the medical records. For example, Pierson maintains the ALJ focused on notes by Dr. Richard Hurd suggesting he slept well with the help of a continuous positive airway pressure (CPAP) device, and in doing so overlooked notes suggesting he was fatigued during the day.  Read in their entirety, however, Pierson's medical records, including those from Dr. Hurd, provide ample support for the ALJ's determination that Pierson's sleep apnea was only mild in nature.   See e.g. Tr. 168-198, 222, 237-266.

Pierson also argues the ALJ erred by not even mentioning the fact that he suffers from asthma.   Pierson notes that reviewing physician Dr. Gary Rapaport indicated he should avoid concentrated exposure to extreme cold, humidity, fumes, odors, dusts, gases, poor ventilation and hazards.  Tr. 285-93.  Even assuming the ALJ erred by not incorporating such a limitation, any such error was

PAGE 16

harmless.  The ALJ concluded based on the vocational expert's testimony that

Pierson could work as a laminator, inspector, or semiconductor assembler.  Tr. 32.

According to the Dictionary of Occupational Titles, none of those jobs involve

concentrated exposure to the environmental conditions identified by Dr. Rapaport.

See DICOT 690.685-258, 669.687-014, and 726.684-034.

## B.  Obesity

Pierson argues the ALJ failed to adequately account for the effect that his

obesity has on his ability to perform work related tasks.

Under SSR 02-1p, obesity is considered "a severe impairment when, alone

or in combination with another medically determinable physical or mental

impairment(s), it significantly limits an individual's physical or mental ability to

do basic work activities," and the ALJ is to evaluate its effect on the claimant's

functional abilities.

The ALJ accepted that Pierson's obesity constituted a severe impairment,

and limited him accordingly to sedentary work.  Pierson argues the ALJ should

have included additional limitations, but does not specify what those limitations

might be, other than a limitation to part time work.  Pierson notes that the ALJ

relied on the opinion of examining physician Dr. Richard Hurd in finding him

capable of performing sedentary work.  According to Pierson, however, Dr. Hurd

PAGE 17

stated that he could only work on a part time basis.

Review of the Dr. Hurd's opinion shows otherwise. Tr. 220-26. Dr. Hurd wrote that Pierson "appeared to move quite easily around the examining room when going through the various maneuvers" asked of him, "did not use any pain behaviors," and was generally able to move about with little difficulty. Tr. 220-26. Dr. Hurd found that Pierson "did not have any positive objective physical findings today and he actually seemed to move quite easily about the table," and "seemed to move quite easily" when he was "walking outside waiting for his wife." Tr. 226. Dr. Hurd concluded that Pierson was "capable of working in a sedentary category of work six hours out of an eight-hour day in a 40-hour week." Tr. 226. Sedentary work generally involves sitting for six hours in an eight hour day, and standing or walking for the other two. 20 C.F.R. § 404.1567(a). Dr. Hurd's opinion can be fairly read as indicating Pierson would be capable of sitting for six hours in an eight hour work day, but saying nothing about whether he would be capable of standing and/or walking the remaining two hours. Particularly in light of Dr. Hurd's other observations during the examination, the ALJ did not err by reading Dr. Hurd's opinion as approving of sedentary level work.

## C.   Other Medical Sources

PAGE 18

Pierson argues the ALJ erred by ignoring or discounting the opinions of two vocational counselors – Hal Pulling and Terri Roach.

Vocational counselors like Pulling and Roach are considered "other sources" that the ALJ is permitted to consider pursuant to 20 C.F.R. § 404.1513(d). Information from "other sources" like Terry and Roach may "provide insight into the severity of the impairment and how it affects the individual's ability to function." SSR 06-3p. The ALJ must provide "germane" reasons for discounting such an "other source" opinion. *See Turner v. Comm'r of Social* Security, 613 F.3d 1217, 1224 (9th Cir. 2010); *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993). The ALJ should evaluate opinion evidence from "other sources," and in doing so consider such factors as how long the source has known the claimant, how frequently the source has seen the individual, whether the opinion is consistent with other evidence, how well the source explains the opinion, the degree to which the source presents relevant evidence to support the opinion, and whether the source has an area of expertise related to the individual's impairment. SSR 06-3p.

In February 2007, Pulling wrote an Employment Statement describing his work with Pierson "on a community-based work assessment in Seeley Lake as a video rental clerk." Tr. 110. Pulling explained that Pierson had "consistently

PAGE 19

missed work shifts due [to] the severity of his health issues and migraine[] headaches, or ha[d] needed assistance to complete required duties." Tr. 110. Pulling wrote that Pierson did "not possess competitive skills for this kind of mostly sedentary, community employment." Tr. 110.

After Pierson's participation in this community-based work assessment, Roach completed a Statement of Infeasibility for the Veteran Administration. Roach wrote that Pierson was not able to "maintain consistent attendance due to the frequency and intensity of his migraine headaches," and also explained that "the quality of his work suffers if he is taking medication to abate the headache symptoms, or if he is recovering from a headache." Tr. 112. Roach concluded that Pierson was "not employable." Tr. 113.

As the ALJ explained when discussing these records, Pulling reached his conclusion primarily based on the fact that Pierson missed several days of work due to migraine headaches.  The ALJ did "not dispute that Mr. Pulling documents his observations of Mr. Pierson's absences," but explained that because Pulling was not a medical provider, he was not able to issue opinions as to the severity of Pierson's medical impairments.  Elsewhere in his decision, the ALJ discounted Pierson's testimony as to the duration and severity of his migraine headaches.  Tr. 27.  Having done so, the ALJ properly discounted Pulling's assessment because it

PAGE 20

was based in large part on the fact that Pierson missed work due to alleged

migraines.  Tr.  30.   The ALJ rejected Roach's assessment for the same reason,

and also observed that the report to which Pierson points was based exclusively on

Pullings observations at the video store.  Tr. 31.   The ALJ rejected other

statements by Roach on the ground that they were "based entirely on Mr. Pierson's

subjective complaints," which rendered them unreliable.  Tr. 31;115-56.  These

constitute sufficiently germane reasons for rejecting the opinions of Pierson's

vocational counselors.

## D.  Credibility

Pierson contends the ALJ did not cite sufficiently clear and convincing

reasons for discrediting his testimony.

In considering a claimant's credibility with regard to subjective symptom

testimony an ALJ must perform a two-stage analysis:  (1) the *Cotton* test; and (2)

an analysis of the claimant's credibility as to the severity of the symptoms.

*Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996) (citing  *Cotton v. Bowen*,

799 F.2d 1403 (9th Cir. 1986)).  The *Cotton* test requires only that the claimant (1)

produce objective medical evidence of an impairment; and (2) show that the

impairment(s) could reasonably be expected to produce some degree of symptom.

*Smolen*, 80 F.3d at 1281-82 (*citing Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th

PAGE 21

Cir. 1991) and *Cotton*, 799 F.2d at 1407-08; 20 C.F.R. § 404.1529(a) and (b)).

If the *Cotton* test is satisfied and there is no evidence of malingering, then the ALJ can reject subjective testimony as to the severity of a claimant's symptoms only by citing specific, clear and convincing reasons for doing so. *Smolen*, 80 F.3d at 1283-84 (*citing Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993)). To assess a claimant's credibility, the ALJ may consider ordinary credibility evaluation techniques, unexplained or inadequately explained failure to seek or follow treatment, and the claimant's daily activities. *Smolen*, 80 F.3d at 1284. However, "[g]eneral findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaint." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (*quoting Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)).

In assessing credibility the ALJ must also consider the factors set forth in SSR 96-7p including:

1.  The individual's daily activities;

2.  The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.  Factors that precipitate and aggravate the symptoms;

4.  The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

PAGE 22

5.      Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.      Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.      Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p; *See also* 20 C.F.R. § 404.1529(c).

Here, the ALJ found that Pierson suffers from morbid obesity, migraine headaches, irritable bowel syndrome, and psoriasis, all of which can reasonably be expected to produce some degree of symptom.  Pierson has thus made a showing sufficient to meet both prongs of the *Cotton* test.

The ALJ acknowledged Pierson's testimony as to the severity of his pain and limitations, but found him less than entirely credible for a number of reasons. Pierson argues the ALJ misconstrued the record when he found that he had completed a treadmill test in 2005, and found it was unlikely that Pierson "would be able to complete an exercise test if he were as restricted as he has alleged."  Tr. 25.   Even assuming this was not a legitimate basis for discrediting Pierson's testimony, the ALJ otherwise provided sufficiently clear and convincing reasons for finding him less than entirely credible.

For example, the ALJ cited several inconsistencies in Pierson's reports to

PAGE 23

his medical providers.  In October 2005, Pierson reported to Dr. Margaret Schlesinger that he could not dress or groom himself, had great difficulty climbing even five steps or walking on flat ground, could not tie his shoelaces, use a vacuum, do yard work, or grip any objects.  Tr. 25, 254.  As the ALJ noted, however, Pierson told Dr. Richard Hurd just one week later that he climbed the five steps leading to his house once a day, was able to care for his own personal hygiene, only sometimes needed help putting on his socks, and was capable of riding one hour in a car without stopping.  Tr. 25, 221.  And contrary to Pierson's report to Dr. Schlesinger just one week earlier, Dr. Hurd found that he had unlimited use of his upper extremities with grasping and lifting.  Tr. 25; 221.

As the ALJ noted, many of Dr. Hurd's other observations belied Pierson's allegations.  Tr. 26.  For example, while Pierson alleged great difficulty walking and sitting, Dr. Hurd observed that he "was able to walk without any apparent distress, [] exhibited no pain behaviors, was able to sit for approximately thirty minutes without any apparent discomfort, and was able to perform a wide range of motions with only little difficulty with rising from sitting."  Tr. 26, 223-26.  The ALJ also noted that while Pierson testified that he was unable to sit for long periods of time, Pulling noted in his vocational assessment that Pierson could "sit for long periods of time at work."  Tr. 112.

PAGE 24

The ALJ also addressed Pierson's allegations of disabling migraines. Pierson testified that his migraines sometimes last for longer than a week, and require urgent care.  Tr. 27; 431-34.  As the ALJ explained, however, there were no medical records documenting any such complaints on his part.  Tr. 27.   The ALJ discussed the medical records in detail throughout his opinion, and essentially found that those records documenting Pierson's complaints of migraines "show a wide variance in the number of headaches he experiences each month, and the number of hours or days the headaches last, but none of them support his allegation of greater than seven-day durations."  Tr. 27.  And as the ALJ also observed, Pierson reported to his doctors on several occasions that his headaches were well managed with narcotic medication, which contradicted his allegations of uncontrolled migraines.  Tr. 27.

These constitute sufficiently clear and convincing reasons for finding Pierson's testimony as to the extent of his pain and limitations not entirely credible.

## IV.  Conclusion

For all of the above reasons, the Court concludes that the ALJ's decision is based on substantial evidence and free of legal error.  Therefore,

IT IS RECOMMENDED that Pierson's motion for summary judgment be

PAGE 25

denied, the Commissioner's motion for summary judgment be granted, and the

Commissioner's decision be affirmed.

DATED this 16th day of March, 2011

/s/ Jeremiah C. Lynch
Jeremiah C. Lynch
United States Magistrate Judge

PAGE 26